**The STATE of Ohio, Appellee,**

**v.**

**REED, Appellant.**

[Cite as *State v. Reed,* 155 Ohio App.3d 435, 2003-Ohio-6536.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19674.

Decided Nov. 26, 2003.

Natalia S. Harris, Montgomery County Assistant Prosecuting Attorney, for appellee.

Barry S. Galen, for appellant.

WOLFF, Judge.

{¶ 1} Rashaan O. Reed was found guilty by a jury in the Montgomery County Court of Common Pleas of murder, with a firearm specification, and of tampering with evidence in connection with the death of Joseph Smith. He received sentences of 15 years to life imprisonment for the murder and two years' imprisonment for tampering with evidence, to be served consecutively both to each other and to another sentence issued in a Miami County case. In addition, the trial court sentenced Reed to three years' actual incarceration for the firearm specification. Reed appeals from his conviction.

{¶ 2} The state's evidence established the following facts:

{¶ 3} Sometime after 10:00 p.m. on October 21, 2000, Reed, along with Marcus Manns, arrived at the apartment of Shawn Robinson and Erica Jones. The four got into Jones's car, a 1983 gray Chrysler, with the intention of going to "hang out." While traveling, Reed spoke with Smith on his cellular telephone, and Reed suggested to his companions that they pick him up. According to Robinson, Reed indicated to him that he was "about to do this nigger." At approximately 10:30 to 10:45 p.m., the group arrived at the residence of Valerie Fenton, Smith's girlfriend. Smith entered the vehicle, and they drove to Reed's residence. They arrived at Reed's residence shortly after 11:00 p.m. As the five individuals were heading towards Reed's apartment, Reed called to Smith, saying, "Come here, Joe. Man, I need to holler at you." Reed and Smith walked around to the side of Reed's apartment building while Robinson, Jones, and Manns went inside Reed's apartment. Sometime after 11:00 p.m., David Egler, whose home overlooks the alley behind Reed's apartment, heard two male voices, followed by a single gunshot. Looking from his bathroom window, Egler observed Smith lying on the ground and bleeding from his head in the alley behind Reed's apartment building. Egler called the police. The police were dispatched at 11:26 p.m. A nine millimeter shell casing was found near Smith's feet.

{¶ 4} Having heard a "sound or something like an echo or cracking sound," Robinson left Reed's apartment and went around the side of the building. He observed Reed walking from the alley toward him. Robinson and Reed went into Reed's apartment, got Jones and Manns, and left to go to some "after-hours joints." Smith was not with them. Before entering the "after-hours joint," Reed held a gun and asked whether he should bring the weapon inside. Robinson responded, "Yeah, you can bring it in here." Robinson identified the weapon as a plastic type Glock 9 millimeter. According to Peter Holloway, an individual whom Reed met at the Miami County jail in January of 2001, Reed disposed of the gun by a river. Subsequent to the shooting, Reed told numerous individuals

that he had killed Smith because he had "messed with" his girlfriend, Rhyan Cartwright, and his children.

{¶ 5} Reed presents three assignments of error on appeal.

{¶ 6} 1. "The trial court committed prejudicial error by denying defendant's right to a fair trial by sustaining objections to defendant's own testimony and by sustaining objections to questions offered to attack and impeach the credibility of the state's witnesses."

{¶ 7} Reed asserts that the trial court committed prejudicial error when it (1) precluded him from offering testimony that he was not present when or where the victim was killed, i.e., alibi testimony, (2) sustained objections to questions offered to attack and to impeach the credibility of the state's witnesses, and (3) denied him the opportunity to impeach the testimony of Stacy Young with prior inconsistent statements. He argues that the trial court effectively denied him his constitutional right to confront witnesses against him when it sustained the state's objections and when it precluded Reed from challenging those witnesses' credibility.

{¶ 8} We begin with the disallowance of Reed's alibi testimony. Crim.R. 12.1 provides:

{¶ 9} "Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. The notice shall include specific information as to the place at which the defendant claims to have been at the time of the alleged offense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted." In *State v. Smith* (1985), 17 Ohio St.3d 98, 17 OBR 219, 477 N.E.2d 1128, paragraph two of the syllabus, the Supreme Court of Ohio held that "Crim.R. 12.1 should be construed liberally and not be applied where no prejudice would accrue to the prosecution, where there is a demonstrable and excusable showing of mere negligence, or where there is good cause shown." However, it has likewise recognized:

{¶ 10} " 'Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played.' " *State v. Jamison* (1990), 49 Ohio St.3d 182, 189, 552 N.E.2d 180, quoting

*Williams v. Florida* (1970), 399 U.S. 78, 81–82, 90 S.Ct. 1893, 26 L.Ed.2d 446. We review the trial court's determination to exclude alibi testimony for abuse of discretion. Id.; *Smith,* 17 Ohio St.3d at 104, 17 OBR 219, 477 N.E.2d 1128.

{¶ 11} Reed first raised the issue of alibi testimony on October 30, 2002, the second day of his trial, in connection with the possible testimony of Marcus Manns, a potential alibi witness. At that time, he filed a motion to finance Manns's transportation from Georgia. The following day, that motion, along with the issue of Manns's ability to testify, were discussed by counsel and the trial court. Reed filed his motion for leave to file notice of alibi out of time on November 1, 2002, the following morning. It is undisputed that this written notice of his intention to claim alibi was not given in a timely manner, as provided by Crim.R. 12.1.

{¶ 12} Defense counsel's discussion with the court indicates that the failure to file the notice in a timely fashion was a product of two factors. First, trial counsel indicated that the private investigator that he had hired made contact with Manns on October 30, 2002. At that time, Manns indicated that he was a key witness but would not give an interview. He would, however, fly to Dayton if someone else paid for the flight. Although Reed's father financed Manns's travel from Georgia, Manns did not arrive in Dayton during the trial. Thus, his potential appearance at the trial was rendered moot. Moreover, because Manns ultimately did not come to Dayton, his 11th-hour discovery by the private investigator no longer provided a justification for permitting belated alibi testimony. Second, trial counsel indicated that the lack of notice was due to a last-minute change in trial strategy. He stated that Reed, contrary to the advice of counsel, decided to testify on his own behalf after the trial began.

{¶ 13} The record demonstrates that the prosecution was unaware of Reed's alibi, and it had no opportunity to investigate the claim. Thus, the state would have been prejudiced by Reed's unanticipated alibi testimony, and Reed has made no showing of excusable neglect or good cause for his delay in providing notice. In light of Manns's failure to appear at trial and Reed's last-minute change in trial strategy, we cannot say that the trial court abused its discretion by excluding the alibi evidence.

{¶ 14} Turning to Reed's argument that the trial court repeatedly disallowed questions that were offered to attack the credibility of the state's witnesses, Reed cites pages 305, 400, 430, 486, 491, 525, 616, 653, 753, 759, 819, 826, 889, 905, and 910 of the trial transcript. As noted by the state, the record does not support Reed's argument. On pages 400, 486, 653, 753, 759, 819, 826, and 910, the state had objected to questions posed by the defense. Each of these objections was overruled, and defense counsel was permitted to inquire further. On page 491, the state objected to the form of the defense counsel's question, i.e., the use of

"and I quote." Reed's counsel withdrew the question and rephrased it. Likewise, on page 530, defense counsel withdrew the question to which the state had objected on page 525. Accordingly, defense counsel was not prohibited by the trial court from asking the questions transcribed on these pages.

{¶ 15} On page 430, the state objected and requested to approach the bench when defense counsel inquired about a videotaped interrogation of Erica Jones. Although it was stated in the form of an objection, the state merely indicated that it would play the entire videotape if necessary. The colloquy was as follows:

{¶ 16} "[Prosecutor]: Just so we're all on the same page together, if you're going to inquire about bits and pieces or a bit of the—or a portion of the videotape, then I'm going to be able to play the whole thing. I want to make sure we're all on the same page together. You can't pick out one thing, and there's—so all I'm saying is the whole tape and everything gets played, if you're going to start taking things out of context or picking portions thereof.

{¶ 17} "[Defense counsel]: Uh-huh.

{¶ 18} "[Prosecutor]: So we're all on the same page together.

{¶ 19} "The Court: Understand?

{¶ 20} "[Defense counsel]: Sure.

{¶ 21} "The Court: Got it.

{¶ 22} "[Defense counsel]: Okay."

{¶ 23} As noted by the state, Reed's counsel was permitted to continue with his line of questioning after this exchange. Accordingly, Reed was not prejudiced by the trial court's handling of this objection.

{¶ 24} On page 306 (we note that no objection was made on page 305), defense counsel questioned Robinson about his felony convictions. In response, Robinson testified that his 1996 conviction was a fifth-degree felony and, further, that he had another felony conviction in 1991. Defense counsel then asked Robinson the nature of the 1991 conviction, drawing an objection from the state. The trial court sustained the objection to the extent that the testimony indicated the offenses underlying the prior criminal convictions, but it permitted defense counsel to inquire as to the existence of those convictions. The trial court's ruling comports with Evid.R. 609. Accordingly, we conclude that Reed was not prejudiced by the trial court's ruling.

{¶ 25} Beginning on page 887, counsel and the court began a discussion of the admissibility of alibi testimony by Reed, and Reed's counsel presented his motion for leave to file notice of alibi out of rule. The trial court overruled the motion and refused to allow Reed to provide an alibi during his testimony. As discussed

above, that ruling was not an abuse of discretion, and we conclude that it does not constitute prejudicial error.

{¶ 26} With regard to page 616, Reed asserts that the trial court erred when it overruled the defense counsel's objection to the reading of a portion of Young's police statement during the state's redirect examination of her. (In its brief, the state notes that the trial court overruled the objection, but fails to appreciate that the objection was raised by defense counsel, rather than the state.) Specifically, Young read that on November 10, 2000, Reed had come over, gotten into her car, and indicated that "Rhyan told him that one of his dudes was messing with her and his little girl. So he took the dude out back, down the alley and shot him in the back of the head. He said he had to get out of state 'cause the dude that was with him told on him.'" At trial, defense counsel asserted that the police statement at issue did not constitute a prior consistent statement, because it was created at the time of Young's second police interview and she had made prior inconsistent statements during her first interview, as brought out on cross-examination.

{¶ 27} Evid.R. 801(D) provides that a prior statement by a witness is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence of motive * * *." In the instant case, we need not decide whether the reading of Young's statement constituted inadmissible hearsay, because even assuming that the police statement did not fall within Evid.R. 801(D), the jury was presented with overwhelming testimony consistent with that statement. Robinson testified that Reed stated: "'I had to do it.' And, 'What's next? Is the nigger going to be messing with my kids?'" Jones testified that about a week and a half after the shooting, Reed was talking with Robinson at their residence, and Reed described how he shot Smith. Heather Wendling, a good friend of Reed's, likewise testified that Reed told her that he had killed Smith because Smith "had tried to rape or something with his baby's mama while he wasn't there." Michael Shoemaker, a "business" associate of Reed's, testified that Reed had told him, referring to Smith, "Motherfucker fucked with my family so I killed the motherfucker." Holloway testified that Reed had told him that he shot Smith and got rid of the gun. He further testified that Reed said that Rhyan had told him that "Joe was messing around with her or either one of the kids, one of them." Finally, Young had previously testified that during a conversation in her car, Reed had told her that he had killed Joe because Joe "was messing with his daughter and his baby's mom." Thus, we conclude that the admission of a portion of the January 8, 2001, police statement was cumulative of the testimony of other witnesses, and it had no

appreciable effect on the outcome of Reed's trial. Accordingly, even assuming that Young's statement constituted inadmissible hearsay, its admission was harmless.

{¶ 28} Turning to the impeachment of Stacy Young, Reed claims, without any specific citation to the record, that the trial court denied him the opportunity to impeach her testimony through prior inconsistent statements. He indicates that Young testified during cross-examination that she did not remember statements that she had made to the police during her first police interview and that Evid.R. 613 permits the admission of extrinsic evidence to impeach a witness under those circumstances. The state responds that it has reviewed the entire portion of Young's testimony, and the record indicates that Reed's defense counsel did, in fact, attempt to impeach Young with police investigation reports. Although not cited by the parties, the record further indicates that defense counsel sought to introduce extrinsic evidence of Young's first police interview through testimony by Detective David Eshelman. The trial court ruled that Young's "continual lack of recollection" did not create an inconsistency that can be impeached. Thus, it did not allow defense counsel to call Detective Eshelman for the purpose of providing extrinsic evidence of Young's first interview with him.

{¶ 29} Evid.R. 613(B) allows the use of extrinsic evidence to impeach by prior inconsistent statement when the following two conditions are satisfied: "(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require; (2) The subject matter of the statement is one of the following: (a) A fact that is of consequence to the determination of the action other than the credibility of a witness; (b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(B), or 706; (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence." Evid.R. 613(B). We have stated that under this rule:

{¶ 30} "If the witness admits making the conflicting statement, then there is no need for extrinsic evidence. If the witness denies making the statement, extrinsic evidence may be admitted, provided the opposing party has an opportunity to query the witness about the inconsistency, and provided the 'evidence does not relate to a collateral matter[.] * * * ' However, if the witness says he cannot remember the prior statement, 'a lack of recollection is treated the same as a denial, and use of extrinsic impeachment evidence is then permitted.' " (Citations omitted.) *State v. Harris* (Dec. 21, 1994), Montgomery App. No. 14343, 1994 WL 718227; see, also, *State v. Taylor* (July 26, 1996), Montgomery App. No. 15119,

1996 WL 417098 ("A prior statement of a witness may be proved by extrinsic evidence if the witness denies the statement or claims he cannot remember the statement").

{¶ 31} In her cross-examination, defense counsel asked Young whether she recalled questions by Detective Eshelman during her first police interview and whether she remembered her answers to those questions. Young indicated that she recalled being asked whether other individuals had talked to her about the shooting and what Reed had said to her about it. However, she repeatedly testified that she did not remember her responses to many of those questions. We agree with Reed that Young's lack of memory regarding her first interview laid a foundation for the admission of extrinsic evidence, such as the testimony of Detective Eshelman, regarding her prior statements. Accordingly, we conclude that the trial court erred when it did not permit defense counsel to present that testimony.

{¶ 32} Under the facts of this case, however, we conclude that the failure to permit Eshelman's testimony regarding his interview with Young constituted harmless error. In other words, there is no reasonable possibility that the error contributed to the defendant's conviction. See *State v. Bayless* (1976), 48 Ohio St.2d 73, 106, 2 O.O.3d 249, 357 N.E.2d 1035; *State v. Young*, Montgomery App. No. 19328, 2003-Ohio-1254, 2003 WL 1193771. Here, although Young's prior police statement was not introduced as substantive evidence, nor was Detective Eshelman permitted to relate her responses, defense counsel presented the relevant portions of that interview to the jury during cross-examination by quoting directly from the transcript of the interview. For example, the following exchange occurred between defense counsel and Young:

{¶ 33} "Q [by defense counsel]: * * * Referring to the first interview, do you recall anyone asking you at that time—and I had quoted; I'll do it again—'Did anybody ever talk to you about Skano killing anybody?' That's the question. Do you remember that?

{¶ 34} "A [Young]: On the first interview, no. I don't remember that.

{¶ 35} "* * *

{¶ 36} "Q: Do you remember answering that question with—a question yourself? And I quote: 'Has he ever or anybody?' Do you remember saying that?

{¶ 37} "A: No.

{¶ 38} "* * *

{¶ 39} "Q: The detective answers in the affirmative. He says, 'Uh-huh.'

{¶ 40} "A: No. I don't remember that.

{¶ 41} "Q: And then you say something—do you remember what that is?

{¶ 42} "A: No.

{¶ 43} "Q: Do you remember saying, and I quote, 'just people talking about it. I mean, coming to my house and saying they been down here talking to you guys.' "

{¶ 44} Thus, as illustrated above, defense counsel successfully presented verbatim the relevant portions of Young's first interview with Detective Eshelman, indicating to the jury the prior inconsistent statements that Young purportedly could not remember. In light of the thorough cross-examination, during which Young was presented with a verbatim account of her prior inconsistent statements, the presentation of extrinsic evidence of those statements would have had minimal impact, at best, on her credibility. Moreover, as stated above, Young's testimony was merely cumulative of other witness testimony at trial. Thus, the jury had substantial evidence, in addition to Young's testimony, that rumors were circulating about Smith's death and that Reed had admitted to killing him. Accordingly, we conclude that Reed suffered no prejudice from the exclusion of Detective Eshelman's testimony regarding Young's first police interview.

{¶ 45} In summary, we conclude that the trial court did not abuse its discretion when it precluded Reed from offering alibi testimony. The trial court did not repeatedly disallow questions that were offered to attack the credibility of the state's witnesses. Thus, Reed's constitutional right to confront the witnesses against him was not violated. Any error by the trial court in allowing the state to present Young's prior consistent statements and in precluding defense counsel from providing extrinsic evidence of her prior inconsistent statements was harmless.

{¶ 46} Reed's first assignment of error is overruled.

{¶ 47} "2. The court should overturn defendant-appellant's conviction, because the verdict is against the manifest weight of the evidence."

{¶ 48} "3. The trial court improperly denied defendant-appellant's motion for judgment of acquittal under Criminal Rule 29."

{¶ 49} In his second and third assignments of error, which we will treat together, Reed claims that the trial court improperly denied his motion for judgment of acquittal and that his conviction was against the manifest weight of the evidence. He contends that the inconsistencies in the witnesses' stories, the lack of physical evidence, and the lack of credibility of the state's witnesses clearly show that the state failed to prove that he committed the offenses of murder and tampering with evidence. Specifically, he claims that the state has failed to prove that he was present at the scene of the shooting on the date in question, that he actually caused or attempted to cause physical harm to Smith,

or that he knowingly disposed of the firearm. He argues that had he been allowed to impeach the witnesses' credibility and to present evidence regarding their motives, the jury would not have found him guilty beyond a reasonable doubt.

{¶ 50} Crim.R. 29(A) provides that the trial court shall enter a judgment of acquittal on one or more offenses charged in the indictment if the evidence is insufficient to sustain a conviction of such offense or offenses. " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 51} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 52} We have no problem finding extensive evidence to support the guilty verdicts on both the murder and the tampering-with-evidence charges. R.C. 2903.02(B) provides that a person commits murder when he "cause[s] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violation that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The state alleged that Smith's death was the proximate result of a felonious assault by Reed. Beginning with Reed's presence at the scene of the crime, Robinson and

Jones testified that they, along with Manns, Smith, and Reed, arrived at Reed's residence shortly after 11:00 p.m. on October 21, 2000. Robinson and Jones further testified that Reed and Smith went down the sidewalk alongside Reed's apartment building toward the alley behind it. They both testified that they, along with Manns, went inside Reed's apartment. Jones testified that they sat down and began to watch television. She further stated that after 10 or 15 minutes, Robinson went outside to look for Reed. Robinson testified that he walked to the end of the sidewalk, and he soon saw Reed walking toward him from the alley. Egler testified that shortly after 11:00 p.m., he heard voices, followed by a gunshot. He testified that he initially took cover, then retrieved a flashlight that was located a few steps from the bathroom. He went to the bathroom window, called his wife over to look, and then they called the police. Officer Mamula testified that he was dispatched to the Egler's address at 11:26 p.m. Although there were no eyewitnesses to the shooting of Joseph Smith, a rational fact finder could find, based on the circumstantial evidence presented, that Reed was present in the alley at the time that Smith was shot, i.e., between shortly after 11:00 p.m. and just before 11:26 p.m.

{¶ 53} The jury was also presented with ample circumstantial evidence that Reed was in possession of the gun used to kill Smith and that he used the gun to kill him. Both Robinson and Jones testified that Reed possessed a gun on the night of the shooting. Robinson testified that before entering the "after-hours joint" subsequent to leaving Reed's apartment on October 21, 2000, Reed held a gun and asked whether he could bring the weapon inside. Jones likewise testified to this conversation. Robinson identified the weapon as a plastic type Glock 9 millimeter. Jeffrey Holmes, a Dayton police officer assigned to the crime scene investigations unit, testified that a 9–millimeter shell casing was found next to Smith's body in the alley and that the lead portion of a bullet was located in the back door frame of Egler's home. Robinson, Jones, Wendling, Holloway, Young, and Shoemaker each testified that Reed told them that he had shot Smith. The jury could have reasonably determined that Reed possessed a firearm while he was in the alley with Smith and that Reed shot Smith on October 21, 2000. In other words, the jury could have reasonably concluded, beyond a reasonable doubt, that Reed had caused the death of Joseph Smith as a proximate result of committing the offense of felonious assault.

{¶ 54} As for the tampering-with-evidence charge, the record demonstrates that Reed was aware of the police investigation of the shooting death of Joseph Smith. Reed himself testified that the police came by his house a couple days after the shooting and that on October 26, 2000, he spoke with Detective Martin at the Safety Building in Dayton. In addition, Peter Holloway testified that Reed admitted to disposing of the gun by a river. Heather Wendling

likewise testified that Reed said that he had killed Joe Smith but that they would not be able to prove it, because "he had got rid of whatever he used." Based on the record, we conclude that Reed's conviction on the tampering with evidence charge was not against the manifest weight of the evidence, nor did the trial court err in overruling his motion for judgment of acquittal on that charge.

{¶ 55} Our conclusion is not altered by the fact that some of the evidence provided by the state's witnesses was inconsistent. During closing arguments, defense counsel argued that Valerie Fenton, Smith's girlfriend, provided evidence that Smith may have been picked up by Robinson, Jones, and Reed closer to 10:30 p.m. In addition, Reed had testified on his own behalf, indicating that they had arrived at his apartment about 10:40 p.m. and that they all (including Smith) went into his apartment. Defense counsel also attempted to impeach the credibility of Jones, Young, Wendling, and Shoemaker by indicating that they either made prior inconsistent statements to the police or that Reed had previously told them that he did not kill Smith. The jury was free to believe the testimony provided by Robinson and Jones and thus to credit the timeline proffered by the state. Moreover, in light of the fact that Robinson, Jones, Young, Wendling, Shoemaker, and Holloway each testified that Reed ultimately had confessed to the killing, the jury could have reasonably concluded that these statements were credible. The trial court's credibility determinations are entitled to great deference by a reviewing court. See *State v. Sherrill* (Jan. 28, 2000), Montgomery App. No. 17359, 2000 WL 84642.

{¶ 56} In addition, the fact that the state's case consisted principally of circumstantial evidence does not warrant reversal of Reed's conviction. It is well settled that a defendant may be convicted solely on the basis of circumstantial evidence. *State v. Nicely* (1988), 39 Ohio St.3d 147, 529 N.E.2d 1236. Moreover, as stated by the Supreme Court of Ohio, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson* (1991), 57 Ohio St.3d 29, 38, 565 N.E.2d 549. As aptly put by the state: "Defendants charged with murder are not to be rewarded for failing to commit their crimes in broad daylight in the presence of witnesses." Accordingly, reliance upon circumstantial evidence to place Reed at the scene of the crime and to prove that he shot Smith and tampered with evidence does not render Reed's conviction against the manifest weight of the evidence. To the contrary, the circumstantial and physical evidence offered by the state strongly supports the convictions for murder and tampering with evidence.

{¶ 57} Reed's second and third assignments of error are overruled.

{¶ 58} The judgment of the trial court is affirmed.

Judgment affirmed.

BROGAN and FREDERICK N. YOUNG, JJ., concur.