OPINION
{¶ 1} On October 22, 2004, Jesse Bach was indicted for the murder of James McLearran ("Jimmy") with a firearm specification, the felonious assault of Heather Hubbs with a firearm specification, and having weapons while under disability. Beginning on August 15, 2005, the murder and felonious assault charges were tried to a jury in the Montgomery County *Page 2 
Court of Common Pleas; the having weapons while under disability charge was tried to the court. The court convicted Bach of having weapons while under disability, but declared a mistrial regarding the other charges. A second jury trial on the murder and felonious assault charges commenced on March 20, 2006. Bach was convicted of both counts, as well as the firearm specifications. The court sentenced Bach to an aggregate term of twenty-six years to life in prison and ordered him to pay restitution in the amount of $9,700.
 {¶ 2} Bach appeals from his convictions, arguing that his convictions are against the manifest weight of the evidence and that his trial counsel rendered ineffective assistance. Bach has not provided a transcript from the first trial, and his arguments focus on the murder and felonious assault convictions. Accordingly, our analysis is likewise directed to those two counts. For the reasons that follow, Bach's convictions will be AFFIRMED.
 {¶ 3} I. "APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
 {¶ 4} In his first assignment of error, Bach claims that his conviction was against the manifest weight of the evidence.
 {¶ 5} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly *Page 3 
competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 6} According to the state's evidence, at approximately 11:50 p.m. on October 12, 2004, 28-year-old Jimmy McLearran was shot nine times with a .22 caliber weapon as he sat in the driver's seat of his car, which was parked in the driveway of his residence at 6362 Howie Avenue in Trotwood, Ohio. Heather Hubbs, who was seated in the front passenger seat, was bruised by one of the bullets.
 {¶ 7} Bach and Jimmy were long-time close friends. However, in the month preceding the shooting, Bach and Jimmy's relationship deteriorated due to conflicts over a stolen Blazer and Jimmy's wife, Michelle McLearran ("Michelle"). Several weeks before the shooting, Bach and Jimmy "flipped" the vehicle identification number from one Chevy Blazer to another to hide the fact that one of the vehicles was stolen. Bach purchased the vehicle with the flipped VIN number from Jimmy.
 {¶ 8} In September 2004, Michelle left Jimmy due to marital difficulties arising from Jimmy's drug habit. After a brief stay with her sister, Michelle took the children and moved to Sam Crawford's home, which was located at 6801 Dayton-Liberty Road. Crawford was a friend *Page 4 
of Michelle's father and an over-the-road truck driver whose job required him to leave home often. Crawford permitted Michelle to stay at the house so that she could watch the house for him while he was gone. Soon after moving to Crawford's home, Michelle became romantically involved with Bach, and he moved into Crawford's home with her. Michelle spoke with Jimmy about her relationship with Bach, and Jimmy was unhappy about it. Bach later told Michelle that Jimmy had threatened to contact the police about the Blazer.
 {¶ 9} In early October 2004, the police stopped Bach while he was driving the Blazer, and the vehicle was seized. At that point, the dispute between Bach and Jimmy escalated. Ronald Collier, Sr., who knew both men, stated that Bach and Jimmy threatened each other, and that he tried to mediate the dispute over the truck. However, a couple of days before the shooting, Bach told Collier that he "was going to put on a hoody and go blow Jimmy's brains out." According to Jimmy's cousin, Derrick Winhoven,[1] Bach complained daily about the VIN flipping, and several witnesses testified that Bach blamed Jimmy for the seizure of the Blazer. Bach demanded that Jimmy return his money, and he wanted Jimmy to tell the police that Jimmy's sister, Betty, had sold him the truck with the VIN already flipped. Collier testified that Bach threatened that "if [Betty] didn't say that the Blazer was like that when he got it, that he was going to blow her head off." Bach left a message on Jimmy's answering machine telling him not to "snitch" on him. Winhoven also testified Bach stated during conversations about the Blazer that he was going to kill Jimmy.
 {¶ 10} On October 10, 2004, Bach was complaining to Crawford and Michelle about the *Page 5 
Blazer and about Jimmy calling the police. Bach was angry and was holding a nine-shot .22 caliber black revolver with an ivory handle. When Michelle responded that Jimmy would never do that, Bach pointed the gun at Michelle's head and said "I ought to shoot you." Crawford asked Bach to take the gun out of the house, and Bach complied. Michelle did not see the gun again.
 {¶ 11} On October 12, 2004, Jimmy called Michelle and asked to see the children. He wanted them to meet his new girlfriend, Hubbs, whom he had met two days before. Michelle spoke with Jimmy and Hubbs, and she would not allow the visitation. Bach, who was with Michelle at the time of the call, responded to the conversation by talking "very loud" and calling Hubbs "a bitch." After the telephone call ended, Bach called someone else on the telephone. Michelle overheard him telling the person that he needed to get his gun back. Bach then left the residence acting "pretty angry."
 {¶ 12} When Bach returned, he and Winhoven briefly worked on Winhoven's car. As they worked, Bach again complained about Jimmy and the Blazer. Some time after Winhoven left, Bach showered and went to the store to purchase beer. He returned with a 40-ounce, but left again "sometime after 9:00 p.m." Bach left wearing dark clothing, and he drove away in a white, four-door Chevy Caprice. Shortly before 10:00 p.m., the surveillance cameras at the gas station located at 6270 West Third Street and Calumet filmed Bach wearing dark clothes and white sneakers. Michelle testified that Bach did not return until after midnight.
 {¶ 13} Shortly before midnight, Jimmy was at his home with Hubbs and his friend, Ronald Collier, Jr., who was known as Taz. Taz had been staying with Jimmy "to make sure that Jesse Bach didn't jump on him." Jimmy and Hubbs decided to purchase marijuana for *Page 6 
Taz's birthday, and they left through the front door and went to Jimmy's white Beretta in the driveway. Hubbs got in on the passenger side, and Jimmy climbed through the broken driver's door window. Taz testified that, after they walked out, he "could have swore that I seen something with a black hoody on" go past the door. Hubbs testified: "[N]o sooner than I shut my door, I heard about eight gunshots, three in a row right like real quick and then about four or five more within a second. It was all within like five seconds." The shots came from the driver's side. When the shooting began, Hubbs glanced toward the driver's side and saw dark clothing. She then turned her body toward the passenger door, covered her head, and screamed. When the shooting ended, Hubbs looked up and saw a male figure in dark clothes with light-colored soles on his shoes running toward the back of the house.
 {¶ 14} Upon hearing "something like fire-crackers go[ing] off," Taz came out of the house and met Hubbs, who stated frantically that Jimmy had been shot. Taz went inside and grabbed a nine-millimeter handgun. He checked on Jimmy and then saw someone moving across the front of the detached garage behind the house. Taz fired one shot, hitting the garage. Taz called his father, Collier, who came to the scene, checked Jimmy, and called 911.
 {¶ 15} Jimmy died from the gunshot wounds. Hubbs testified that, during the shooting, she felt "something in [her] left breast area right under [her] nipple," and she developed a dark bruise there a couple of days later. The shirt that she was wearing had a tear in the breast area which was not there before the shooting.
 {¶ 16} Bach returned to Crawford's house after midnight with his brother. At that time, he was wearing an orange Orioles t-shirt, light blue jeans, and red and gray Nike tennis shoes. Bach told Michelle that she "didn't have to worry about Jimmy anymore, that he had shot him." *Page 7 
Michelle told Bach to go see if Jimmy needed help and she woke Crawford, who was in his bedroom. Crawford called Collier to get details about the shooting. Bach and his brother left the house.
 {¶ 17} In response to Collier's 911 call, officers from the Trotwood Police Department and the Montgomery County Sheriffs Office responded to 6362 Howie Avenue. Their investigation quickly led them to search for Bach. At approximately 12:45 a.m. on October 13, 2004, Sergeant Michael Hild, Deputy Molly Haas, and two Dayton police officers drove southbound on Calumet on their way to 6801 Dayton-Liberty Road. As they reached the S-curve, they passed a white, boxy Caprice containing two men with similar features. Not recognizing the individuals, the officers proceeded to Crawford's house. Shortly before 1:00 a.m., Hild observed the same white Caprice coming over the small hill on Dayton-Liberty Road toward them. At this time, the vehicle had only one occupant, Bach. Bach was taken into custody.
 {¶ 18} After Bach's arrest, Bach made several incriminating statements. At approximately 6:30 a.m. on October 13th, Trotwood Detective Brad Williams interviewed Bach. Bach claimed that he had left Crawford's house between 9:50 p.m. and 10:00 p.m. and that he was with Michelle when he received a telephone call from a friend that Jimmy had been shot. Bach stated that Michelle had asked him to check on Jimmy at his home on Howie Avenue, and that he went to that area but did not go to the actual house. Williams did not believe Bach's story and asked Bach if he had shot Jimmy. Williams testified that Bach "became very upset, very nervous, started shaking, his knees were bouncing" and that Bach dropped his head and said "he couldn't take all this shit." Williams got Bach a glass of water, and when he returned, *Page 8 
Bach stated, "Williams, you know what happened" and that, due to the seriousness of what he had done, he did not think he wanted to answer any more questions. Later, Bach asked to speak with Williams again. Williams testified that Bach wanted to know whether he was going to get the death penalty, twenty-five years, or life in prison for what he had done.
 {¶ 19} Winhoven testified that he spoke with Bach on the telephone approximately one week after the shooting. Bach asked Winhoven if he (Winhoven) was mad at him (Bach) for shooting Jimmy. When Winhoven responded affirmatively, Bach asked Winhoven if he could forgive him.
 {¶ 20} James Baumstark testified that he was incarcerated with Bach in the Montgomery County Jail between November 2004 and January 2005. Baumstark was in jail due to a parole violation for an offense in Nevada. During his incarceration in Dayton, Baumstark played cards at night with Bach and another inmate, Jeffrey Hedges. Baumstark testified that Bach talked about his case "almost every night." Based on those conversations, Baumstark testified: "This is how I understand it. He [Jesse] was staying over at a girl's house that was like across town. * * * And that he had drove across town, he drove through the neighborhood like twice, I believe he said, and he stopped at a gas station, was sitting at the gas station contemplating what he was going to do. And then he drove over to like a wooded lot and parked on the other side of the wooded lot, went through the wooded lot into the neighborhood, and approached the house. It was my understanding that he didn't know if the guy — he knew the guy was there, but he didn't know if he was in the house or — because from what I get is when he walked up to the house, he was kind of like surprised he saw him in the car. And that's when he opened fire through the car window. And somebody came out of the house and returned fire, and he fire again, and then *Page 9 
he ran, ran back through the wooded lot to his car and drove away."
 {¶ 21} In November 2004, Michelle received a letter from Jeffrey Hedges, telling her to write an affidavit that Bach had been at home with her at the time of the shooting and that she had been coerced by the police into making a false statement against him.
 {¶ 22} On August 19, 2005, Deputies Jerry Schwartz and Scott Carter were with Bach in the courthouse elevator following closing argument in his first trial. Bach turned to Schwartz and asked if he had heard the prosecutor's closing argument. Schwartz and Carter testified that, when Schwartz said he had not, Bach stated: "The way [the prosecutor] talked, you would have thought he was there when I did it."
 {¶ 23} In his defense, Bach called Taz as a witness. Taz testified, in part, that he informed the 911 operator that Jimmy's sister, Betty McLearran, had threatened Jimmy.
 {¶ 24} On appeal, Bach asserts that there are reasons to distrust the evidence against him. He notes that Jimmy was involved in drugs and illegal activity, which might arguably have led to his death. Hubbs testified that Jimmy had argued with Betty earlier in the day, and Betty was present at the crime scene shortly after the crime occurred. Michelle testified that she first told the police that Bach had been with her and had not committed the crime and that she wrote to Bach in jail, speaking of his innocence and their plans to reunite. There was evidence that Michelle became involved with Winhoven shortly after the shooting. Baumstark testified that he initially informed police officers of Bach's statements at the jail in the hope that he would get his parole transferred to Ohio from Nevada. Bach contends that Schwartz and Carter merely testified to their interpretation of his comment to them. Bach further argues that the jury may been confused by the prosecutor's repeated substitution of the date September 12, 2004 when he *Page 10 
apparently meant to reference October 12, 2004.
 {¶ 25} Upon review of the record, we find ample evidence to support Bach's conviction. The state provided substantial evidence that Bach was irate over the incident with the Blazer and had threatened to kill Jimmy; that Bach obtained a .22 caliber weapon, the same caliber that was used during the shooting; that Bach was wearing clothes similar to that described by witnesses at 6362 Howie Avenue prior to the shooting; that Bach was not at Crawford's house at the time of the shooting, as he claimed; and that Bach returned home in different clothing. Such evidence is strong circumstantial evidence that Bach committed the offenses for which he was convicted. Moreover, the state presented statements from several witnesses that Bach confessed to doing the shooting. Although the jury could have found the state's evidence to be incredible or unpersuasive for the reasons offered by Bach on appeal, the jury was not required to do so. We afford great deference to the factfinder's credibility determinations. See State v. Sherrill (Jan. 28, 2000), Montgomery App. No. 17359; State v. Reed, 155 Ohio App.3d 435,445, 2003-Ohio-6536, 801 N.E.2d 862. Viewing the evidence as a whole, the jury clearly did not lose its way when it credited the state's evidence.
 {¶ 26} The first assignment of error is overruled.
 {¶ 27} II. "APPELLANT WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 28} In his second assignment of error, Bach claims that his trial counsel rendered ineffective assistance by failing to object to certain testimony introduced at trial.
 {¶ 29} In order to demonstrate ineffective assistance of counsel, Bach must *Page 11 
establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. "Reversal of a conviction for ineffective assistance of counsel `requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" State v. Hand,107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d. 151, at ¶ 199. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland,466 U.S at 694; Bradley, 42 Ohio St.3d at 142.
 {¶ 30} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. SeeStrickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.;State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 31} On appeal, Bach argues that his trial counsel should have objected to portions of Hubbs's, Collier's, Crawford's, and Michelle's testimony. Beginning with Hubbs, Bach asserts that his trial counsel improperly allowed Hubbs to testify that she noticed a bruise on her breast a couple of days after the shooting and that she had been in shock and had not paid attention at the time of the shooting. Bach argues that *Page 12 
this testimony unfairly implied that Hubbs had been a victim of the shooting.
 {¶ 32} The state correctly argues in response that count two of the indictment charged that Bach "did knowingly cause or attempt to cause physical harm to another, to wit: Heather Hubbs, by means of a deadly weapon or dangerous ordnance, to wit: handgun," in violation of R.C. 2903.11(A)(2). Hubbs's testimony regarding the bruise on her breast and the tear in her shirt, both of which did not exist prior to the shooting, was evidence that Hubbs had been nicked by a bullet and thus had suffered physical harm by means of a handgun. Bach's trial counsel did not render ineffective assistance when he failed to object to Hubbs's testimony.
 {¶ 33} Bach also asserts that his trial counsel should have objected to Crawford's testimony that there was a dispute between Bach and Jimmy over a truck, and that the serial numbers were "messed up." Crawford had also testified that the sheriff's department told him about the VIN number. Upon review of the transcript, Crawford next testified that Bach himself had expressed to Crawford that he was upset about the truck. Bach had stated to Crawford that he wanted his money back from Jimmy but that Jimmy would not return any of the money. Bach's statements to Crawford were admissible as admissions under Evid. R. 801 (D)(2). We find no basis to conclude that Bach's trial counsel was ineffective by failing to object to Crawford's testimony.
 {¶ 34} Next, Bach contends that Michelle's testimony regarding the VIN flipping was hearsay and lacked foundation. Michelle testified that Bach and Jimmy had flipped the VIN number on a Blazer, that Bach had then purchased the vehicle from Jimmy, and that Bach still owed money on the vehicle when she started to see him *Page 13 
romantically. Although Michelle did not identify the source of her knowledge during direct examination, she testified during cross-examination that she learned about the VIN flipping from talking to Bach and that she had never talked to Jimmy about it. Accordingly, Michelle's testimony about the VIN flipping was admissible under Evid. R. 801(D)(2), and Bach's trial counsel did not err in failing to object to her testimony.
 {¶ 35} Bach also claims that his trial counsel should have objected to Michelle's testimony that Bach shot Jimmy. Bach claims that this statement called for an unfair conclusion that was made without an adequate foundation. During the prosecutor's redirect examination, the prosecutor asked Michelle the following without objection:
 {¶ 36} Q: "As a matter of fact, on October 12th, 2004, after midnight when you learned that your husband was shot and killed, who was the only person on the planet that told you they did it?"
 {¶ 37} A: "Jesse Bach."
 {¶ 38} Q: "And what did Bach tell you?"
 {¶ 39} A: "That he shot Jimmy."
 {¶ 40} Q: "And you won't have to what anymore?"
 {¶ 41} A: "Worry about him anymore."
 {¶ 42} Q: "Nobody else on the planet called you and said to you, `I shot Jimmy McLearran,' did they?"
 {¶ 43} A: "No."
 {¶ 44} Q: "Those words came from that defendant's lips, didn't they?"
 {¶ 45} A: "Yes."
 {¶ 46} Q: "Who shot your husband?" *Page 14 
 {¶ 47} A: "Jesse."
 {¶ 48} Although the prosecutor's final question might have improperly called for an opinion, the preceding questions indicated that Michelle's testimony that Bach shot her husband was based on Bach's confession to her that he committed the offense. Considering the preceding answers, which were properly admitted, Bach clearly was not prejudiced by his attorney's failure to object to the final question.
 {¶ 49} Finally, Bach argues that his trial counsel should have objected to statements by Collier about the dispute between Bach and Jimmy on the ground that the statements were hearsay or lacked foundation. Bach notes that Collier testified without objection that Jimmy had told him that he (Jimmy) had learned that Michelle was living at Crawford's house with Bach, and that Jimmy had said that Bach called him and told him that he wanted Jimmy to say that Jimmy's sister sold Bach the Blazer as it was. Collier further testified: "Jimmy would come to me and tell me that [Bach] was calling him and threatening him on the phone, talking about blowing his brains out. Then he would tell me he was going to do the same to [Bach]. I'm trying to be a mediator and tell them both, `No truck ain't worth that. Just let it go.' But evidently, I guess — I guess it was worth that."
 {¶ 50} Even assuming that this portion of Collier's testimony was based on hearsay, the record is replete with similar statements from other witnesses. As stated supra, Winhoven testified that Bach complained about the VIN flipping and the Blazer almost daily, and Winhoven learned from Bach himself about the VIN flipping and that Bach blamed the loss of the Blazer on Jimmy due to the conflict over Michelle. Crawford, Collier, and Michelle testified that they heard Bach complain about the *Page 15 
Blazer and his anger toward Jimmy over the truck. Williams also testified that, during an interview with Bach, he discussed the VIN flip with him. Williams testified that Bach indicated that the feud between Jimmy and him concerned two major things — Bach's relationship with Michelle and a VIN-flipped Blazer that Bach had bought through Jimmy and in which Bach had been caught. In light of the substantial evidence regarding the dispute between Bach and Jimmy over the Blazer, Collier's statements are merely cumulative and were not prejudicial. Moreover, to the extent that Collier implied that Bach shot Jimmy due to the dispute over the Blazer, Collier merely articulated an inference that was amply supported in the record, particularly in light of Bach's repeated confessions to the shooting. Based on the record as a whole, Bach has not demonstrated that his trial counsel rendered ineffective assistance.
 {¶ 51} The second assignment of error is overruled.
 {¶ 52} The judgment of the trial court will be affirmed.
BROGAN, J. and DONOVAN, J., concur.
[1] Winhoven died prior to the second trial. His testimony from the first trial was read into the record. *Page 1