OPINION
{¶ 1} Eric Pearson was convicted by a jury in the Montgomery County Court of Common Pleas of attempted rape, gross sexual imposition, kidnaping, and felonious assault with a deadly weapon. He was acquitted of felonious assault due to the infliction of serious physical harm. He was sentenced to five years of imprisonment for the attempted rape, kidnaping, and felonious assault, to be served concurrently, and to nine months in prison for gross sexual imposition, to be served concurrently with the other offenses. Pearson appeals from his convictions.
 {¶ 2} According to the state's evidence, at approximately 3:30 p.m. on June 8, 2004, R.N. left her apartment on El Morado Place in Dayton to go for a jog along the Great Miami River bikeway. She walked up the stairs to a grassy area at the top of the river walk and then walked down the stairs to get to the path along the river. R.N. headed west on the bikeway, passing some men who were fishing. As she reached a small river dam, she saw a man, who she later identified as Pearson, walking down the hillside on the grass. Pearson reached the path and walked past her. Soon, R.N. reached a point where the path was blocked by some men and their trucks. She turned around to return to her apartment. As she traveled eastward, she noticed that Pearson was again on the top of the hill, this time under the overpass for Interstate 75. Out of the corner of her eye, R.N. saw him start back down the hill and walk behind her. Pearson stayed behind her as she climbed the steps to go up the hill to her apartment.
 {¶ 3} As R.N. got to the top step, she was grabbed from behind. Pearson placed one hand over her mouth and the other around her neck in a choke-hold, and began to drag her toward the highway. R.N. began to scream. As she screamed and tried to wriggle away, Pearson told her to "stop or I'm gonna cut your throat." Under the overpass, he bent R.N. over a low concrete wall along the walkway. Pearson cut R.N.'s bra strap, shirt, and the drawstring of her pants with a small knife. R.N. attempted to sit down so he could not take off her pants. She felt Pearson unzipping his pants and rubbing his groin area on the back of her bottom. As R.N. screamed louder, he began to slam her head and face down into the concrete and the gravel of the wall. He grabbed her by her hair, pulling out a clump.
 {¶ 4} When Pearson began to fumble with his zipper and her pants, R.N. almost got out of his grasp. Pearson dropped the knife and grabbed her with both arms. R.N. grabbed the knife and told Pearson to "just run away." Pearson responded, "No. You're mine now." Pearson began to punch R.N. on the back of her head, groped her, and tried to pull the knife out of her hand. Pearson repeatedly instructed R.N. to "throw the knife." Eventually, Pearson let go and began running toward McKinley Park.
 {¶ 5} R.N. ran to her apartment building and contacted the police from her neighbor's apartment. Officers Tiffany Conley and Matthew Staker were dispatched at 4:36 p.m. R.N. gave her clothing and the knife to the officers and showed them where the attack occurred. R.N. gave a description of her attacker as a black male, approximately 5'7" tall, 120 pounds, eighteen to nineteen years old, with a medium-sized afro, and wearing a white t-shirt and blue jean shorts. A canine unit, consisting of Officer William Geiger and his dog, Turk, met the group under the overpass. Turk, Geiger, and Conley began to track the suspect from the overpass.
 {¶ 6} Turk followed a scent through McKinley Park, across Palmer Street and Grand Avenue, through a yard and an alley, and to a parking lot at Grandview Hospital. At the parking lot, the officers spoke with Rick Couch, a security officer for the hospital, and asked him if he had seen the subject walking across the lot. Couch indicated that he had noticed a small-built black male coming across an alleyway that runs eastbound across the lot. The man was wearing blue jean shorts and had no shirt, but was carrying a white t-shirt in his hands. Couch also testified that he was wearing white tennis shoes and was walking very fast. The officers continued with their track, northbound on Forest Avenue and eastbound on Neal Avenue. After Turk began to sniff the air and raise his head a lot, the officers returned to Forest and Neal, and began tracking again. Turk tracked along Neal Avenue. There, the officers spoke with Luong Vo, who stated that he saw a man matching the suspect's description going in the side yard of the building at 119 Neal Avenue. Vo did not see the man's face. Turk tracked to a door at 119 Neal Avenue. Pearson lived in apartment 2A at that address. When the officers arrived, Pearson was not there.
 {¶ 7} The next day, Detective Jo Quinn showed R.N. a photo line-up. R.N. selected Pearson's photograph. The following day, R.N. went to the police station for a physical line-up. The individuals in the line-up repeated phrases that R.N.'s assailant had spoken to her. R.N. again identified Pearson. On June 17, 2004, Pearson was indicated for attempted rape, gross sexual imposition, kidnaping, and two counts of felonious assault. He was convicted and sentenced, as described above.
 {¶ 8} Pearson appeals from his convictions, raising four assignments of error on appeal. We will address them in an order that facilitates our analysis.
 {¶ 9} II. "THE TRIAL COURT ERRED IN ADMITTING TESTIMONY REGARDING SCENT TRAILING BY A POLICE DOG IN THE ABSENCE OF PROPER FOUNDATION."
 {¶ 10} In Pearson's second assignment of error, he claims that the trial court improperly admitted evidence regarding the scent trailing abilities of the police dog, because the state failed to establish a proper foundation for that evidence. As noted by the state, Pearson objected to labeling Officer Geiger as an expert witness. He did not, however, object to Geiger's "ability to testify to what the dog did" due to a lack of foundation. Accordingly, we review Pearson's claim for plain error.
 {¶ 11} In Ohio, evidence of canine tracking is admissible, provided that the state establishes a proper foundation. Statev. Dickerson (1907), 77 Ohio St. 34, 82 N.E. 969. To establish that foundation, the state must present evidence of the training and reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the trailing by the dog. Id. at syllabus; State v. Taylor, Allen App. No. 1-03-20, 2003-Ohio-7115.
 {¶ 12} In the present case, Officer Geiger testified that he was trained and certified by the State of Ohio as a canine handler, which means that he was partnered with a police work dog. Geiger stated that he and his dog, Turk, were trained and certified through the state for patrol work, which consists of tracking, area search, article search, and criminal apprehension. Turk also has a drug certification. According to Geiger, from December 2001 to February 2002, the pair underwent three months of training at the Island County Sheriff's Department Canine Training Facility in Fort Wayne, Indiana. The training began with obedience and moved on to other areas of police work, including tracking. Initially, the tracking training began with simple tracks and progressed to tracking across different terrains, longer tracks, and more complicated trails. Geiger indicated that Turk is a tracking dog, who can follow scent rafts, which are dead skin cells that are thrown off of a person's body. Geiger indicated that, during 2004, he and Turk trained once a week for five hours per day on every Tuesday. He stated that they trained on tracking, article searches, and narcotics detection. Geiger testified that, as part of the training, he learned to read Turk's body language, some of which is common to canines in general and some of which is unique to the dog.
 {¶ 13} As for the track from the site of R.N.'s attack, Geiger's testimony included a detailed account of the route that they followed and of Turk's behavior during the track. Geiger indicated that they began at the location of the incident and headed in the direction that the assailant reportedly went. The track began shortly after the attack occurred. Geiger testified that it was a "strong track," that Turk was concentrating on what was in front of him, and that he was not distracted by other animals. Although Geiger indicated that Turk began to sniff the air and raise his head a lot while they were on Neal Avenue, he further stated that, upon returning to a spot where the scent had been strong, Turk again began to track. The track ended at 119 Neal Avenue.
 {¶ 14} Upon review of Geiger's testimony, the state established that Geiger was qualified as a canine handler, that he and Turk had received substantial training, that Turk was trained in the tracking of scent rafts, that the tracking began at a location where the suspect had been, and the tracking occurred under circumstances in which Turk was able to track. Although Pearson contends that Turk is a "drug dog" and that his training on human tracking was not established, this assertion is belied by the record. Moreover, Geiger indicated that the master trainer would "wash" an animal if he believed it could not perform as a patrol dog. In response to jury questions, Geiger further testified that Turk was tested in tracking a human being as part of the certification process and that he would have failed that portion if he were unable to track.
 {¶ 15} We note that the trial court cautioned the jury about giving undue weight to the dog tracking evidence. Specifically, the jury was instructed: "The dog trailing evidence must be viewed with utmost caution. It is of slight probative value. It must be considered in conjunction with all the testimony in the case and does not warrant a conviction absent some other direct or circumstantial evidence of guilt."
 {¶ 16} In sum, the state presented a proper foundation for the admission of Geiger's testimony regarding the canine track, and the court properly cautioned the jury against giving the evidence undue weight. Accordingly, the trial court did not abuse its discretion or commit plain error in admitting this evidence.
 {¶ 17} The second assignment of error is overruled.
 {¶ 18} III. "THE TRIAL COURT ERRED IN ADMITTING TESTIMONY REGARDING OUT-OF-COURT IDENTIFICATION OF THE DEFENDANT-APPELLANT BY THE ALLEGED VICTIM."
 {¶ 19} In his third assignment of error, Pearson asserts that the court erred in admitting the victim's out-of-court identifications. He asserts that the identification procedures were unduly suggestive and unnecessary.
 {¶ 20} As noted by the state, on November 5, 2004, Pearson filed a motion to suppress the evidence of R.N.'s pre-trial identification of him as the perpetrator of the offenses against her. Although there is no transcript in the record, a hearing on that motion was apparently held on February 22, 2005. In addition, while the trial court failed to file a written entry overruling that motion, the trial transcript makes clear that the court denied the motion to suppress. Because Pearson failed to file a transcript of the suppression hearing, we cannot review the trial court's ruling on that motion.
 {¶ 21} On appeal, Pearson relies upon the evidence presented at trial to challenge the admissibility of R.N.'s pre-trial identifications. Although we do not know whether the evidence presented at trial mirrors the evidence presented at the suppression hearing, we find no error in the trial court's ruling based on the evidence presented at trial.
 {¶ 22} "To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was `so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances. Simmons v. United States (1968),390 U.S. 377, 384. See, also, Manson v. Brathwaite (1977), 432 U.S. 98,106; Neil v. Biggers (1972), 409 U.S. 188, 199; State v.Broom (1988), 40 Ohio St.3d 277, 284; State v. Moody (1978),55 Ohio St.2d 64, 67. As we stated in State v. Keene (Sept. 20, 1996), Montgomery App. No. 14375, unreported,
 {¶ 23} "`When an eyewitness to a crime is shown a series of photographs in an effort to identify a perpetrator, and the manner or mode of the presentation suggests that one individual is more likely than the others to be the perpetrator — such as when the photograph of one individual is in some way emphasized — undue suggestion may occur, increasing the likelihood of misidentification and violating the due process rights of a defendant so identified. Simmons v. United States (1968),390 U.S. 377; Neil v. Biggers (1972), 409 U.S. 188; State v.White (Feb. 2, 1994), Clark App. No. 3057, unreported. Identification testimony tainted by an unduly suggestive out-of-court identification procedure may be suppressed. However, even if an identification procedure is unduly suggestive, the identification testimony derived therefrom is not per se inadmissible solely for that reason. Reliability of the identification is the linchpin in determining its admissibility.Manson v. Brathwaite (1977), 432 U.S. 98. As long as the identification itself is reliable, it is admissible despite the suggestive nature of the identification procedure. Neil v.Biggers, supra; Manson v. Brathwaite, supra; State v. Moody
(1978), 55 Ohio St.2d 64 [9 Ohio Op.3d 71]; State v. White,supra. Reliability is determined from the `totality of the circumstances,' which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the identification procedure. Biggers, supra;Brathwaite, supra.'" State v. Robinson (Jan. 26, 2001), Montgomery App. No. 17393.
 {¶ 24} At trial, Detective Quinn and R.N. testified that R.N. was asked to come to the police department on June 9, 2004, to give a statement. After receiving a written statement from R.N., Quinn presented her with a photo array. Quinn began by reading her the pre-printed instructions on the photo spread, which included statements that the person who committed the crime may or may not be included in the group of photographs and that hair styles, beards and moustaches may easily be changed. Quinn then showed R.N. a photo spread of six individuals, including Pearson. R.N. identified Pearson as her attacker, although she noted that her assailant had longer hair. Pearson does not argue that the photo spread or the instructions was unduly suggestive, and we find no basis to conclude that they were.
 {¶ 25} Quinn further testified that she asked Detective Burke to conduct a physical line-up. According to Quinn and Burke, the physical line-up was conducted at 10:00 a.m. on June 10, 2004, with Pearson and four other individuals. Pearson was permitted to select his number for the line-up, and he selected number seven. The other individuals were provided numbers at random. Before the line-up began, R.N. was again read pre-printed instructions.
 {¶ 26} During the line-up, each man was asked to step forward and say a fake name, John Jones. He was then asked where he lived, to which he was to respond "Dayton, Ohio." Each man was given several statements to say: "Stop or I'll cut your throat," "Bend over," "No way, you're mine now," and "Throw the knife." After speaking into the microphone, each man walked toward and away from Burke (in order to provide R.N. a side view) and then returned to his place in line. At the completion of the line-up, R.N. identified number seven as her attacker.
 {¶ 27} Pearson claims that the physical line-up was unduly suggestive, because he was the only individual who appeared in both the photo spread and the physical line-up. He states: "[T]he alleged victim need only choose the only common face in both identification tools. [Pearson] asserts that allowing an alleged witness the opportunity to arrive at the identification of a suspect simply through the process of elimination does not indicate that the so-called witness necessarily maintains an accurate memory of the events."
 {¶ 28} Assuming, arguendo, that permitting R.N. to view Pearson twice in a two-day period was suggestive, we do not find that R.N.'s identification after the physical line-up was unreliable. R.N. testified that, upon seeing Pearson at the microphone, she "got a little flustered" and "freaked out without showin' it." When she heard Pearson's voice, she started crying. R.N. testified: "I know I'll be able to forget that face if I give it enough time, but I'm not gonna be able to forget the voice." As demonstrated by R.N.'s testimony, her identification of Pearson during the physical line-up was based on her identification of Pearson's voice in addition to his physical appearance.
 {¶ 29} Pearson asserts that R.N.'s identification is unreliable, because she had a limited opportunity to view her assailant during the attack. R.N. testified that she first observed Pearson walking down the hillside on the grass. Pearson reached the path and walked past her. R.N. stated that she saw him again as she was returning to her apartment. At this time, he was again at the top of the hill. R.N. continued to observe him "out of the corner of [her] eye" as he started back down the hill and walked behind her. After the attack, R.N. was able to provide a detailed description of her assailant to the police. Although R.N. had only a limited opportunity to observe Pearson, her first identification of him occurred within twenty-hours of the attack. Although she expressed some hesitancy during the identification, R.N. explained that Pearson's hair in the photograph looked different than what she had remembered. Considering the totality of the circumstances, the trial court could have reasonably determined that R.N.'s identification from the photo spread was reliable.
 {¶ 30} As noted above, R.N.'s second identification of Pearson involved an identification of his voice as well as his physical appearance. R.N. testified that her assailant made several statements to her during the attack, including "Stop or I'm gonna cut your throat," "No. You're mine now," and "Drop the knife." The physical line-up occurred within forty-eight hours of the incident, and R.N. testified that she recognized Pearson's voice as that of her attacker. Although Pearson was the only individual in both the photo spread and the physical line-up, the evidence in the record supports a conclusion that R.N.'s second identification was also reliable. Accordingly, based on the evidence presented at the trial, the court did not err in admitting testimony regarding R.N.'s out-of-court identifications. The weight to be given to the identifications was a matter for the jury.
 {¶ 31} The third assignment of error is overruled.
 {¶ 32} I. "DEFENDANT-APPELLANT'S CONVICTIONS WERE BASED ON INSUFFICIENT EVIDENCE AND WERE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED TO THE COURT."
 {¶ 33} In his first assignment of error, Pearson claims that the state presented insufficient evidence to support his convictions and that his convictions were against the manifest weight of the evidence.
 {¶ 34} "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed. 1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis,79 Ohio St.3d 421, 430, 1997-Ohio-372, 683 N.E.2d 1096, citingJackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781,61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 35} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387, citing State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 36} Pearson claims that the state failed to prove that he was the individual who attacked R.N. He argues that there was no physical evidence tying him to the assault and that the testimony of Vo excludes him as the person who Vo had seen. Pearson emphasizes that he presented three alibi witnesses who corroborated his whereabouts on June 8, 2004.
 {¶ 37} Upon review of the record, we find ample evidence to support Pearson's conviction. R.N. provided the police with a description of her assailant, stating that he was approximately 5'7" tall, 120 pounds, eighteen to nineteen years old, with a medium-sized afro, and wearing a white t-shirt and blue jean shorts. A police canine that was trained to track human beings followed a scent from the crime scene to the apartment building where Pearson resided. Along that route, a security guard indicated that he had seen a small-built man wearing blue jeans shorts and carrying a white t-shirt. Vo likewise saw a man, holding his pants in an odd manner and not wearing a shirt, go into the gate at 119 Neal Avenue; Vo did not see his face. Although Vo did not identify Pearson as the individual he saw going to 119 Neal Avenue, his testimony and prior written statement did not necessarily exonerate Pearson. Moreover, as stated above, R.N. twice identified Pearson as her assailant. Based on the above testimony, the state presented sufficient evidence that Pearson was R.N.'s assailant.
 {¶ 38} In his defense, Pearson presented the testimony of three alibi witnesses: Richard Hammond, Gerry Green, and Debra Manson. He also testified in his own defense. Green, who lives in the same apartment building as Pearson, testified that he knocked on Pearson's wall around noon on June 8, 2004, and went over to Pearson's apartment to play video games. Green also called Hammond to invite him over to play with them. According to Hammond, Green, and Pearson, Hammond arrived at Pearson's apartment at approximately 3:30 p.m. Although Hammond was due at work at 4:00 p.m. that day, he stayed until approximately 4:30 p.m. and caught the 4:30 bus to work. Green testified that he left at approximately 4:45 p.m. because he needed to go to his bank before it closed. Because the branch near Miami Valley Hospital closed at 5:00 p.m., Green caught a bus to the Dayton Mall. To support his testimony, Green provided a bank receipt from 5:40 p.m. from the Dayton Mall branch of the Universal One Credit Union and a bus transfer ticket from that day. Green further testified that he provided the police with a written statement, which supported Pearson's alibi, on June 10, 2004. He indicated that he changed his statement after being threatened by the officer.
 {¶ 39} Manson, Pearson's mother, testified that she received a call from Pearson at 4:38 p.m., asking her to pick him up. She stated that they had made plans for Pearson to do yard work at her house. Manson arrived at Pearson's apartment at approximately 4:50 p.m. and blew her car horn. She stated that Pearson came out, first with his barber tools and then with a bag of laundry. Pearson remained at Manson's home until 9:00 p.m. or 9:30 p.m., when Manson brought him home.
 {¶ 40} Testifying on his own behalf, Pearson reiterated the version of events told by Hammond, Green, and Manson. He asserted that he had been playing video games with Green throughout the afternoon, and that Hammond joined them around 3:30 p.m. He also testified that Hammond left for work and Green left a few minutes later to catch the bus to the Dayton Mall. He reiterated that his mother picked him up and that he returned home to watch a Detroit versus Los Angeles basketball game. Pearson denied that he had been near the river bikeway and that he had attacked R.N. Pearson testified that he told the police that "he didn't do it" and that he had requested the physical line-up because he was not the assailant. Pearson also testified that he was thirty-two years old on June 8, 2004.
 {¶ 41} Based on the evidence presented by Pearson, the jury could have found the state's evidence to be incredible or unpersuasive. However, it was not required to do so. The jury could have, instead, found R.N.'s identification of Pearson to be credible and reliable. Moreover, the jury could have found that the evidence regarding the dog tracking, in conjunction with the testimony of the security guard and Vo, demonstrated that Pearson had been near the river bikeway on June 8, 2004, and had returned to 119 Neal Avenue from that location. In addition, although Hammond's and Green's testimony supported Pearson's alibi, the jury could have concluded that Green's statement that he had not seen Pearson after 3:00 p.m. was the accurate one and that Hammond had not been truthful in his testimony. We afford great deference to the factfinder's credibility determinations. SeeState v. Sherrill (Jan. 28, 2000), Montgomery App. No. 17359;State v. Reed, 155 Ohio App.3d 435, 445, 2003-Ohio-6536,801 N.E.2d 862. Accordingly, upon review of the record, Pearson's conviction was not against the manifest weight of the evidence.
 {¶ 42} The first assignment of error is overruled.
 {¶ 43} IV. "THE TRIAL COURT ERRED IN GRANTING THE REQUEST OF THE JURY TO REPLAY TESTIMONY BY WITNESSES FOR THE PLAINTIFF-APPELLEE FOLLOWING THE INCEPTION OF DELIBERATIONS BY THE JURY."
 {¶ 44} In his fourth assignment of error, Pearson claims that the trial court erred in allowing large portions of testimony from the state's witnesses to be replayed for the jury during deliberations.
 {¶ 45} As conceded by Pearson, the Supreme Court of Ohio has stated: "After jurors retire to deliberate, upon request from the jury, a court in the exercise of sound discretion may cause to be read all or part of the testimony of any witness, in the presence of or after reasonable notice to the parties or their counsel."State v. Berry (1971), 25 Ohio St.2d 255, 267 N.E.2d 775, paragraph four of the syllabus.
 {¶ 46} In the present case, after two hours of deliberating, the court received a request from the jury to re-view R.N.'s testimony. After consultation with counsel, with Pearson present, the court determined that it would allow the jury to re-hear the testimony with all sidebars muted. Prior to re-playing the testimony for the jury, the court instructed the jury not to read lips or try to interpret what was being said during the sidebars and that those portions should not be considered. The court also stated:
 {¶ 47} "The other caution I wanna give you in replaying testimony is that you don't give undue weight to this testimony as to — as opposed to the testimony of others just because we're replaying for you at this point. I want you to be very careful that all the testimony has to be considered and considered fully, not just the testimony of [R.N.]."
 {¶ 48} At the completion of the playback, the court also reminded the jury that any statements that were ordered stricken or to which the court sustained an objection should be treated as though they had not heard them and that the jurors should not consider any suggestion included in a question that was not answered.
 {¶ 49} A couple of hours later, the court granted another request from the jury to review the testimony of Vo. The court repeated its instruction that Vo's testimony not be given undue weight because it was being replayed. There is no suggestion in the record that Pearson objected to the repeating of Vo's testimony. Thirty minutes after deliberations had resumed, portions of R.N.'s testimony were again replayed. Pearson apparently did not object to the replaying of excerpts from R.N.'s testimony.
 {¶ 50} Upon review, we find no abuse of discretion in the trial court's permitting the jury to rehear portions of the trial testimony during deliberations, and the court properly gave a cautionary instruction to the jury not to give the re-played testimony undue weight.
 {¶ 51} The fourth assignment of error is overruled.
 {¶ 52} The judgment of the trial court will be affirmed.
Donovan, J. and Milligan, J., concur.
(Hon. John R. Milligan retired from the Fifth District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio).