[Cite as *State v. Pelfrey*, 2018-Ohio-2427.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27474 |
| | : | |
| v. | : | Trial Court Case No. 15-CR-1306 |
| | : | |
| GREGORY D. PELFREY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of June, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, P.O. Box 291771, 101 Southmoor Circle NW, Kettering, Ohio 45429
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Gregory D. Pelfrey was convicted in the Montgomery County of Common Pleas of theft from an elderly or disabled adult ($37,500 or more, but less than $150,000), a second-degree felony, and two counts of tampering with evidence, third-degree felonies. The charges stemmed from allegations that Pelfrey obtained a power of attorney from his grandmother, altered the date of it, and used it, unbeknownst to the grandmother, to obtain a $75,000 mortgage loan on her home; Pelfrey's grandmother did not receive the money. After defendant was aware of the criminal investigation, defendant had two different individuals fabricate documents to help his case.

{¶ 2} Pelfrey appeals from his conviction, raising five assignments of error. He argues that (1) the trial court erred in excluding his expert witness, (2) the trial court erred in denying his motion to continue the trial, (3) his convictions were based on insufficient evidence and against the manifest weight of the evidence, (4) the trial court violated his right to a speedy trial, and (5) the trial court erred in allowing parol evidence regarding the power of attorney.

{¶ 3} For the following reasons, the trial court's judgment will be affirmed.

## I. Background and Procedural History

{¶ 4} For approximately 48 years, Judith Daniel resided in a house on Connie Drive in Franklin, Ohio. Daniel and her husband purchased the home in 1967, the mortgage loan was paid off in 1983, the couple had raised their children there, and her husband died there in 2012. In March 2014, Daniel was 73 years old, and the home was in need of repair.

{¶ 5} National Title Company in Centerville, Ohio, closes loans for people when

they buy and sell real property. National Title's owner, Ray Woodie, also arranges loans for individuals through a network of private lenders; these loans usually involve situations where the borrower intended to "flip" the property, i.e., sell it again quickly. Woodie had previously arranged for private loans for Greg Dart, an acquaintance of Daniel's grandson, Pelfrey. In February 2014, Dart contacted Woodie, asking if Woodie could arrange for Pelfrey to obtain a private loan. Pelfrey told Woodie that he was going to fix up his grandmother's house. Woodie arranged for Pelfrey to obtain a $75,000 loan from Troy Pinkerton, a participant in Woodie's private network of lenders; Daniel's house would serve as security for the loan.

{¶ 6} On March 31, 2014, Pelfrey went to National Title to close on the private loan. When Pelfrey did not bring his grandmother to National Title and did not have a power of attorney for her, Woodie told Pelfrey that it was necessary to have Daniel's power of attorney to close on the loan.

{¶ 7} According to Daniel, that same day (March 31), Pelfrey approached her about signing a power of attorney. Pelfrey told Daniel that he had sold his business to Dart for $100,000, but that Dart was not going to pay the first $50,000; instead, Dart would fix Daniel's house. Pelfrey told Daniel that he needed her to sign a power of attorney so that he could authorize Dart to perform the work. Daniel testified that, on March 31, she picked up Pelfrey at his girlfriend's residence, and they drove to a bank where Daniel had a document notarized granting Pelfrey a power of attorney for that one day. Daniel was apprehensive about the power of attorney and called Pelfrey afterward to see if he had used it; Pelfrey told Daniel that he had not.

{¶ 8} On April 1, 2014, Woodie received a phone call from a man identifying

himself as Pelfrey, asking Woodie to explain the transaction to his grandmother. Woodie spoke to the woman on the phone, and he believed he was talking to Daniel. At trial, Daniel denied that she had spoken with Woodie.

{¶ 9} Later that day (April 1), Pelfrey returned to National Title with the power of attorney. While there, Pelfrey, as attorney in fact for Daniel, closed on a one-year $75,000 loan from Pinkerton; neither Daniel nor Pinkerton was present. Under the terms of the promissory note, Daniel agreed to pay Pinkerton $991.13 for 12 months, followed by a balloon payment of $71,390.40 on April 1, 2015. The note was secured by a mortgage on Daniel's residence. Pelfrey received a check made payable to Daniel for $71,174 from National Title. (The check was not for the full $75,000 due to closing costs.) Daniel testified that she never would have signed the power of attorney if she knew Pelfrey were going to obtain a mortgage loan and that she only signed the power of attorney because of his statement that it was needed for Dart to do repairs on her home.

{¶ 10} The power of attorney presented to Woodie and recorded with the Warren County Recorder's Office was dated and notarized on April 1, 2014. At trial, Daniel acknowledged that her initials and signature were on the document, but she said it looked different from the one she had signed. Daniel had previously told Detective Daniel Osterfeld of the Centerville Police Department that Pelfrey had approached her about the power of attorney on April 1, not March 31.

{¶ 11} The record does not reflect when the check to Daniel was cashed and how the check was spent, but no money was provided to Daniel. Daniel testified that Dart and Pelfrey came to her home a couple of times to discuss possible repairs. Daniel

called Pelfrey the day after they had spoken about the repairs, and she told Pelfrey to stop the work on her house, because she did not think $50,000 would cover it. Daniel testified that somebody built a small deck on the front of her house (but did not finish it), and a little room was built in her garage; she thought that the builder worked for Dart. It is unclear when that work on her house occurred.

{¶ 12} On June 13, 2014, Daniel learned that the power of attorney had been used to secure a loan and that there was a lien on her house. Daniel also received correspondence from the Warren County Recorder's Office, which prompted her to call Pelfrey; Pelfrey came to Daniel's residence, took the correspondence, and said that he would take care of it. However, Daniel repeatedly received bills from Pinkerton that she was unable to pay.

{¶ 13} At some point, Daniel spoke with Detective Osterfeld about the power of attorney and the lien on her house. Osterfeld spoke with Pelfrey about the March 31/April 1 transaction in late November 2014.

{¶ 14} On April 29, 2015, Daniel executed a quit claim deed conveying her property, in lieu of foreclosure, to Pinkerton. Daniel vacated the residence in May 2015. Pinkerton testified that he performed approximately $25,000 in repairs on the property and that he had a contract to sell the property for $110,000.

{¶ 15} In May 2015, Pelfrey was residing in Miami, Florida. There, he met Ruken Oral and began a relationship with her; Pelfrey introduced himself as Ryan Owen.

{¶ 16} On November 6, 2015, Pelfrey was indicted for (1) theft from an elderly or disabled adult ($37,500 or more, but less than $150,000/ beyond scope of consent), in violation of R.C. 2913.02(A)(2) (Count 1); (2) forgery (uttering a forged power of attorney),

in violation of R.C. 2913.31(A)(3) (Count 2); and (3) theft from an elderly or disabled adult ($37,500 or more, but less than $150,000/ deception), in violation of R.C. 2913.02(A)(3). Pelfrey was not immediately served with the indictment. The record reflects that, at this time, Pelfrey was incarcerated in Danville, Kentucky, on unrelated charges.

{¶ 17} In January 2016, Oral learned Pelfrey's actual name upon looking up Pelfrey's ex-wife, whose name Pelfrey had mentioned. When Oral confronted Pelfrey about his identity, Pelfrey became angry and told Oral not to trust anyone named Detective Osterfeld if the detective ever contacted her.

{¶ 18} On February 8, 2016, Pelfrey sent handwritten instructions to Oral, asking her to conduct research on Dart and for her to prepare an affidavit with specific averments that Pelfrey provided. Stated generally, the affidavit by Oral was to describe a sexual relationship between Oral and Dart, describe Dart as the person behind the power of attorney and the National Title loan, and indicate that Pelfrey was misled by Dart regarding the loan. Pelfrey asked Oral to mail three original copies back to him, noting, "This is very important to getting the charge dropped and released." Oral had an affidavit prepared, as instructed. The typed date on the affidavit was January 7, 2015, but it was notarized on February 25, 2016, in New Jersey, where Oral was then residing.

{¶ 19} On June 29 or 30, 2016, Pelfrey, while incarcerated in Kentucky, completed paperwork requesting that he be returned to Ohio to face the pending charges, pursuant to the Interstate Agreement on Detainers (IAD), codified in Ohio as R.C. 2963.30.[1] On July 6, 2016, Pelfrey was served with the indictment in Danville, Kentucky, and returned

---

[1] The paperwork is not in the record. Pelfrey's motion to dismiss states that he signed the paperwork on June 29. At the October 18, 2016 arraignment on the B Indictment, the prosecutor stated that Pelfrey singed the paperwork on June 30.

to Ohio.  Pelfrey appeared in Montgomery County, Ohio, for arraignment on July 12, 2016.

{¶ 20} By July 2016, Oral believed Pelfrey was being "disloyal" to her, and on July 6, 2016, Oral contacted Detective Osterfeld.  Oral met with the detective on July 13, 2016, and provided him the handwritten instructions by Pelfrey (State's Exhibit 11) and the typed and notarized affidavit she prepared (State's Exhibit 12).  Oral testified that none of the statements in the affidavit was true.  She stated that she did not know Dart when she prepared the affidavit.

{¶ 21} The trial court set a scheduling conference for July 26, 2016.  Pelfrey's counsel moved for a continuance to gather additional discovery; the trial court reset the conference for August 9, 2016.  (The document containing counsel's motion and the court's entry was filed on July 27.)  At the August 9, 2016 conference, the trial court scheduled the final pretrial conference for October 4 and the trial for October 17, 2016, and Pelfrey's counsel requested a continuance until that time; the court granted the continuance.  (A written motion for continuance and the court's entry granting the motion were filed on August 10, 2016.)

{¶ 22} In the late summer of 2016, while Pelfrey was in the Montgomery County Jail, Pelfrey became acquainted with Katrina Bercot, who spoke with him and visited him at the jail.  Bercot's testimony is somewhat unclear, but it appears that her boyfriend was incarcerated with Pelfrey at the Montgomery County Jail and that her boyfriend "got [her] started" with helping Pelfrey.

{¶ 23} In September 2016, Bercot received handwritten instructions from Pelfrey.  The instructions told Bercot to type up a handwritten agreement that he was providing,

print it, photocopy the agreement with signatures that he was providing, destroy the signatures, and mail three copies back to Pelfrey. Pelfrey also had a series of phone calls with Bercot (which were recorded by the jail), where they talked about having Bercot type up a document, put signatures on it, and deliver it to Pelfrey's attorney. The agreement stated, in its entirety:

I Greg Dart agree to complete the renovation and remodel at 3523 Connie St, Franklin, oh 45005. Pay any outstanding balance owed to any contractor, for work completed to date, and repay the $3,000.00 I borrowed from you, for the 4pts to generate the loan against your Grandmas house from the proceeds at closing.

The renovation and remodel will be completed no later than September 1, 2014 at which time I will pay the loan off, and complete the purchase of Go reclaimed.

In exchange, I expect the proceeds from the loan to be signed over and endorsed to [I]ntrigue Property Management, So I can Handle the dispensing of any and all funds for record purposes, full access and rights to go reclaimed, LLC including but not limited to any unsold reclaimed material and inventory, Barns needing to be Dismantled, customer and vender contracts, Tools owned by the company, and any phone number, email, or Domain associated with business.

This agreement will be considered Valid and Binding upon both parties agreeing to the terms Herein and signing and Dating below.

(Grammatical, punctuation, and capitalization errors sic.) The typed agreement

appeared to be signed by two individuals, Pelfrey and presumably Dart (illegible), on April 1, 2014. Bercot later provided the handwritten instructions (State's Exhibit 7), the handwritten agreement (State's Exhibit 8), and the typed agreement (State's Exhibit 9) to the police.

{¶ 24} Bercot testified that she also sent text messages to an individual on Pelfrey's behalf, as instructed by Pelfrey. The messages told the recipient not to lie about his (the recipient's) involvement in the loan, his presence at the closing on April 1, and about being with Pelfrey when the check was cashed. The messages show "Greg" (presumably Dart) as the recipient, but Bercot did not know whom she had texted. (*See* State's Exhibit 13.) Bercot testified that she visited Pelfrey in jail and got the exact wording and phone number for the messages from Pelfrey.

{¶ 25} The office of Pelfrey's attorney received a copy of the purported April 1, 2014 agreement between Pelfrey and Dart, and it was relayed to Pelfrey's attorney. On October 7, 2016, Pelfrey's counsel provided the prosecutor a copy of the purported April 1, 2014 agreement as part of counsel's reciprocal discovery in this case.

{¶ 26} The same day (October 7), Pelfrey was indicted for tampering with evidence, in violation of R.C. 2921.12(A)(2), based on his conduct regarding the affidavit in February 2016 (B Indictment).

{¶ 27} Pelfrey appeared for his arraignment on the new tampering with evidence charge on October 18, 2016. At that time, the prosecutor stated that "we have a new trial date" of December 12, 2016, for both cases. The prosecutor noted that Pelfrey's speedy trial time on the initial charges was running under the IAD, and the December date met those requirements. On the same date, the prosecutor informed Pelfrey's

attorney that additional discovery would be forthcoming that might implicate Pelfrey with another additional criminal charge. Later that month, Pelfrey's counsel received information that the April 2014 agreement may have been fabricated.

{¶ 28} On November 16, 2016, Pelfrey was indicted for tampering with evidence, in violation of R.C. 2921.12(A)(2), based on his conduct between September 1, 2016 and October 14, 2016 related to the purported April 1, 2014 agreement (C Indictment). Pelfrey's counsel moved to withdraw as counsel the same day.

{¶ 29} The trial court appointed new counsel for Pelfrey on November 28, 2016. The following day (November 29), Pelfrey and his counsel appeared for a final pretrial conference. Counsel told the court that he had informed Pelfrey that he (the attorney) was scheduled for trial on December 12 before a different judge and that he needed additional time to get ready for this case. Counsel indicated that Pelfrey was willing to sign a time waiver to accommodate a continuance of the trial date. Pelfrey told the court that he understood that the time waiver applied to "all three" indictments. Pelfrey signed the time waiver; the waiver form referenced R.C. 2945.71, but not the IAD. On November 30, 2016, the trial court set the pretrial conference for February 21, 2017, and the trial for March 6, 2017.

{¶ 30} On December 13, 2016, the parties met for a scheduling conference, at which time the parties and the court discussed Pelfrey's speedy trial deadline under the IAD. The prosecutor indicated that Pelfrey needed to sign a new time waiver, because his prior form did not include the IAD; Pelfrey indicated that he would not sign the form. The prosecutor initially stated that the deadline was December 19, 2016; defense counsel stated that he could not be prepared by then and had a conflict for that date. After looking

at the case docket, the prosecutor then noted that Pelfrey's speedy trial time under the IAD was extended due to Pelfrey's original counsel's request for a continuance from August 10 to October 17, 2016. Pursuant to that discussion, the trial court filed a revised notice of appearance, setting the pretrial conference for January 17, 2017, and trial for January 30, 2017. Defense counsel reiterated that Pelfrey would not agree to the January 30 trial date, but he (counsel) would be ready for trial then.

{¶ 31} On January 10, 2017, Pelfrey filed several pretrial motions, including a motion for the approval of a handwriting expert and fees. The motion indicated that the expert would analyze handwritten notations on the power of attorney. The trial court granted the motion on January 23, 2017.

{¶ 32} On January 17, 2017, Pelfrey filed a motion to dismiss, claiming that his 180-day right to a speedy trial under the IAD had lapsed.[2] Pelfrey argued that the motion for continuance filed by prior defense counsel in August 2016 should not have tolled the IAD speedy trial time, and the State was required to try Pelfrey by December 28, 2016. The trial court overruled the motion.

{¶ 33} The matter proceeded to a jury trial on January 30, 2017. Before jury selection, the State sought to exclude Pelfrey's handwriting expert on the ground that the expert's report was untimely. The trial court sustained the motion. At trial, Pelfrey proffered the testimony of his handwriting expert, the expert report, and the documents that the expert had examined.

---

[2] On January 9, 2017, Pelfrey filed a pro se motion to dismiss on the same grounds. The trial court overruled the pro se motion as improper because Pelfrey was represented by counsel.

{¶ 34} On February 1, 2017, after deliberations, the jury found Pelfrey guilty of all counts. The court ordered a presentence investigation; both parties file sentencing memoranda. At sentencing, the trial court merged Counts 1 and 2 into Count 3 and sentenced Pelfrey to eight years for theft from an elderly or disabled adult ($37,500-$150,000/deception). The court imposed 30 months for each of count of tampering with evidence, to be served consecutively to each other and to Count 3, for an aggregate sentence of 13 years in prison. Pelfrey was also ordered to pay $85,000 in restitution to Daniel and court costs.[3]

{¶ 35} Pelfrey appeals from his convictions. We will address the assignments of error in an order that facilitates our analysis.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 36} In his third assignment of error, Pelfrey claims that his convictions were based on insufficient evidence and against the manifest weight of the evidence.

{¶ 37} A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

---

[3] The $85,000 restitution order reflected the value of Daniel's home prior to its conveyance to Pinkerton. Pinkerton testified that he was selling the home for $110,000 after performing $25,000 in repairs.

{¶ 38} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 39} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 40} In reviewing challenges based on the sufficiency and/or manifest weight of the evidence, we consider the evidence admitted at trial. This includes evidence that was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.). And, we cannot

consider evidence that was excluded by the trial court.

{¶ 41} Pelfrey makes a general argument that his convictions were based on insufficient evidence and against the manifest weight of the evidence, because several of the State's witnesses were not credible. Pelfrey states in his appellate brief:

The victim in this case, Judy Daniel, is an elderly woman whose testimony regarding important dates conflicted with the statements she made to the investigating detective, Detective Osterfeld of the Centerville Police Department. State's witness Ray Woodie, who was from National Title, processed the closing for the note and mortgage, and testified that at the prompting of Detective Osterfeld, he prepared a scrivener's affidavit that the dates he originally inserted in the closing documents were incorrect. State's witnesses Karina Bercot and Ruken Oral testified that they were granted immunity from prosecution in exchange for their testimony. Witness Oral denied writing a key document, which the Defendant's expert witness would have testified, if permitted, that said document matched the written statement she provided to the Centerville Police Department. The exclusion of Defendant's expert witness and reports adversely affected his ability to present a defense as to that charge.

{¶ 42} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Pelfrey had committed theft, forgery, and

tampering with evidence.   *State v. Ball*, 2d Dist. Clark No. 2017-CA-54, 2018-Ohio-605, ¶ 27.

{¶ 43} In the State's original indictment, the State charged Pelfrey with knowingly uttering a forged power of attorney knowing that he was facilitating a fraud; it asserted that the power of attorney used by him contained dates that he changed from the original power of attorney signed by Daniel.   (*See* Bill of Particulars, filed Jan. 26, 2017.)   The State further charged Pelfrey with theft of Daniel's home equity and ownership interest in her home by (1) exceeding the scope of any consent given by Daniel and (2) misleading Daniel regarding the use of the power and using a fraudulent power of attorney beyond the scope authorized by Daniel and after it had been revoked.   The B and C Indictments charged Pelfrey with tampering with evidence based on his causing two false documents -- Oral's affidavit and the April 1, 2017 agreement – to be made.

{¶ 44} At trial, the State's witnesses and exhibits, if believed, provided sufficient evidence to convict Pelfrey of each of the charged offenses.   While Pelfrey argues that the jury should not have credited some of the witnesses' testimony, "witness credibility is not a proper matter on review of the sufficiency of the evidence."   *State v. Wilks*, 2018-Ohio-1562, __ N.E.3d __, ¶ 162.

{¶ 45} Through cross-examination, defense counsel challenged various aspects of the State's case, and there was some evidence that Daniel signed the power of attorney on April 1 after talking with Woodie.   As a result, the jury could have reasonably concluded that Daniel was mistaken at trial when she testified that she signed the power of attorney on March 31, 2014.   In addition, there was evidence from which the jury could have concluded that Pelfrey intended to use the funds to repair Daniel's home and that

he had begun those repairs. Nevertheless, the jury heard the conflicting evidence and was tasked with determining each witness's credibility. Upon review of the entire transcript, we cannot conclude that the jury lost its way when it credited the State's version of events and found Pelfrey guilty as charged.

{¶ 46} Pelfrey's third assignment of error is overruled.

### III. Exclusion of Expert Witness

{¶ 47} In his first assignment of error, Pelfrey claims that the trial court erred by excluding his expert witness.

{¶ 48} Crim.R. 16(K) provides:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 49} The trial court has discretion to regulate discovery in a manner consistent with Crim.R. 16. Crim.R. 16(L); *State v. Mobley*, 2d Dist. Montgomery No. 26858, 2016-Ohio-4579, ¶ 23. If it comes to the court's attention that a party has not complied with Crim.R. 16 or the court's discovery order, the trial court may "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just

under the circumstances." Crim.R. 16(L)(1).

**{¶ 50}** The Ohio Supreme Court has held that "[a] trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of the syllabus. This holding applies equally to discovery violations committed by the State and by the defense. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 42.

**{¶ 51}** Pelfrey sought to call a handwriting expert, David Hall, to testify about his (Hall's) comparison of a written statement provided by Oral to the Centerville Police Department and a handwritten note dated September 17, 2016, which purports to be signed by Oral. The September 17, 2016 note included a statement where Oral apologized for "sleeping with Dart again"; Oral apparently denied creating the September 17 handwritten note. Pelfrey proffered that Hall's opinion would have been that, after comparing those two handwritten items, both documents were completed by the same writer. Hall prepared a written report, which was dated January 28, 2017, i.e., two days before trial.

**{¶ 52}** Before jury selection on January 30, 2017, the prosecutor sought to exclude testimony from Hall, arguing that it had received Hall's report on January 29 and that it was untimely. The prosecutor noted that the documents at issue were created on July 23, 2016 and September 17, 2016, and there was no reason why Hall's opinion could not have been disclosed more than 21 days before trial. The prosecutor noted that prior counsel knew about the two documents and could have had them compared earlier. The

prosecutor further argued that the State was prejudiced by the late disclosure in that it could not get its own expert to refute Hall's conclusion.

**{¶ 53}** Defense counsel responded that he had filed a motion for a handwriting expert on January 10, 2017, albeit to analyze a different document. Counsel stated that he was not aware of these two documents until after he obtained prior counsel's file on the case approximately two weeks before trial. Counsel stated that he reviewed prior counsel's file over the next few days and discovered Oral's September 17 note. Counsel told the court that he turned the note over to the prosecutor and learned "this past Friday while at the jail, that [Oral's] claiming that that's not her handwriting. The information within it is – directly goes to her credibility; goes against her bias. The B indictment directly, squarely rests on her shoulders and she's admitting in a letter that she slept with a material witness in the direct indictment, Greg Dart * * * ." Counsel stated that he could not get an expert more than 21 days ago, because he did not have September 17 document and he had just become aware that Oral was denying that she wrote it. Finally, defense counsel asserted that the State was not prejudiced, because Oral would not testify until the next day. As stated above, defense counsel proffered Hall's testimony during the trial; his report and the two documents are part of the record.

**{¶ 54}** The trial court reasonably granted the State's motion to exclude Pelfrey's expert. Pelfrey was indicted in November 2015, and his prior counsel entered a notice of appearance in March 2016. On July 14, 2016, prior counsel acknowledged receipt of the State's discovery packet, requested discovery from the State, and acknowledged his duty of reciprocal discovery. (Oral's statement to the police was made on July 13, 2016, the day before prior counsel received the State's discovery packet.)

{¶ 55} Original counsel withdrew on November 22, 2016, and new counsel was appointed on November 28, 2016. The trial date of January 30, 2017 was set at the December 13, 2016 scheduling conference; the parties understood that this trial date was established due to the speedy trial constraints of the IAD. Although Pelfrey's second trial counsel apparently was not aware of Oral's September 17 handwritten note and her repudiation of that note until shortly before trial, Pelfrey's original counsel was aware of the note, as it was in his files. Prior counsel could have requested a comparison of the two documents, but did not.

{¶ 56} Moreover, even though the State was aware that Pelfrey's second attorney wanted a handwriting comparison performed, Pelfrey's January 10, 2017 motion for a handwriting expert referred to handwritten notations on the power of attorney, not the two documents signed by Oral. And, there is nothing in the record to suggest that the State was aware (until it received Hall's report) that Hall would be asked to examine two documents by Oral. The State did not receive Hall's reported until January 29, 2017, the day before trial.

{¶ 57} On this record, the trial court did not abuse its discretion in granting the State's motion to exclude Hall's testimony. The first assignment of error is overruled.

### IV. Motion for Continuance

{¶ 58} In his second assignment of error, Pelfrey claims that the trial court erred by denying his motion to continue the trial.

{¶ 59} While responding to the State's motion to exclude Pelfrey's handwriting expert, Pelfrey's counsel asked the court to continue the trial if it were to exclude the expert. After granting the State's motion to exclude Pelfrey's expert, the court asked the

parties to address Pelfrey's motion for a continuance.

{¶ 60} The State opposed the motion, noting that the case had been set for trial twice (October 17 and December 19), and the document at issue, i.e. Oral's September 17, 2016 handwritten note, was not disclosed to the State before either of those trial dates. The State further argued that Pelfrey had manufactured "multiple documents in this case and should not be allowed to benefit from yet another continuance so he can create more documents, or so he can continue to delay this process for documents to get into before this Court documents that he has created and evidence related to them."  Additionally, the prosecutor noted Pelfrey's prior objections to continuances and his pro se motion to dismiss based on a speedy trial violation.

{¶ 61} Pelfrey's counsel responded that Pelfrey was willing to agree to a continuance, despite his prior filings.  Counsel also reiterated that he had found the handwritten note from Oral in prior counsel's file; Pelfrey did not provide it directly to him (current counsel).   The State replied that, because Oral's purported note was addressed to Pelfrey, Pelfrey had possessed the note at some point, and it was given to prior defense counsel.

{¶ 62} The prosecutor further argued that the note could only be used for impeachment of Oral, if it was admissible at all.   Pelfrey's counsel responded that the note was admissible under Evid.R. 404(B) as evidence of Oral's "motive to fabricate."

{¶ 63} The trial court orally overruled the motion without explanation.

{¶ 64} The granting or denial of a continuance is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion.   *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981).   "There are no mechanical tests

for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Citation omitted.) *State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489, ¶ 18; *State v. Jones*, 2d Dist. Clark No. 2013 CA 118, 2014-Ohio-4605, ¶ 15.

{¶ 65} "In determining whether a trial court abused its discretion when ruling on a motion for a continuance, a reviewing court must weigh any potential prejudice to the defendant against the trial court's 'right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.' " *State v. Pattson*, 2d Dist. Montgomery No. 23785, 2010-Ohio-5755, ¶ 19, quoting *Unger*. The trial court should consider such factors as: (1) the length of the requested continuance; (2) any prior continuances; (3) the inconvenience to the litigants, witnesses, opposing counsel and the court; (4) reasons for the delay; (5) whether the defendant contributed to the delay; (6) and any other factors relevant to the unique facts of that case. *Unger* at 67-68; *Fairman* at ¶ 19.

{¶ 66} We find no abuse of discretion in the trial court's denial of a continuance. Pelfrey requested a continuance on the morning of trial, so that he could present his handwriting expert at a later trial date. The State received the handwriting expert's report on the day before trial, and there was no indication that the State was aware that Hall would be examining Oral's handwriting. Defense counsel had been aware that the trial date had been moved forward to January 30, 2017 due to the statutory constraints of the IAD and Pelfrey's assertion of his speedy trial rights (i.e., his motion to dismiss based on a violation of IAD's time constraints). Although defense counsel had been appointed in late November 2016, the change in counsel was occasioned by Pelfrey's alleged

fabrication of the April 1, 2014 agreement and prior counsel's disclosure of that agreement to the prosecutor, which made prior counsel a potential (and actual) witness. The trial court could have reasonably concluded that Pelfrey contributed to the need for the delay; that the inconvenience to the State, its witnesses, the court, and potential jurors (who had been summoned and were waiting while the motions regarding the expert and the continuance were addressed in a sidebar discussion) would be significant; and that the circumstances warranted proceeding with the trial as scheduled.

{¶ 67} Additionally, we note that, even if the continuance had been granted, Pelfrey would not have benefited, because the expert's proposed testimony would not have been admissible at trial. As stated above, the expert would have expressed the opinion that the same person wrote (1) the statement Oral provided to the Centerville Police Department and (2) the disputed September 17, 2016 note that Oral, during cross-examination, denied writing. The first part of the disputed note expressed Oral's remorse for her statements to Detective Osterfeld and indicated that she spoke with the detective because she "was so hurt" that Pelfrey was "still talking to" another woman. The second part of the note suggested that Oral did, in fact, have a sexual relationship with Dart, as her affidavit (the basis of the B Indictment) indicated.

{¶ 68} Evid.R. 616 permits the use of extrinsic evidence to impeach a witness for bias, prejudice, interest, or any other motive to misrepresent. The note (assuming it was written by Oral) -- not the expert's proffered testimony and report -- was directed to Oral's relationships with others and her motives for her conduct. However, the first part of the note did not suggest that Oral was untruthful in her statements to the detective, only that she was sorry to have spoken with the detective. Nor did the note indicate that Oral had

a motive to lie at trial when she testified that the statements in the affidavit were false.

{¶ 69} To the extent the note suggested that portions of the affidavit were truthful (i.e., her relationship with Dart), the note is simply a prior inconsistent statement by Oral that related to the credibility of her trial testimony. The expert's opinion would have been extrinsic impeachment testimony aimed at the credibility of Oral's claim that she was not the author of the note, and, by extension, her general credibility as a witness.

{¶ 70} Evid.R. 613 allows the admission of extrinsic evidence regarding a prior inconsistent statement when two conditions are met: (1) the impeaching evidence is a matter of consequence to the action's resolution other than the witness' credibility, and (2) the evidence relates to a fact that may be established by extrinsic evidence under Evid.R. 608(A), 609, 616(B), or at common law. *State v. Reed*, 155 Ohio App.3d 435, 2003-Ohio-6536, 801 N.E.2d 862, ¶ 29 (2d Dist.). The expert's proposed testimony was only directed to Oral's credibility. Under these circumstances, the expert's proposed testimony would not have been admissible under Evid.R. 613(B). Thus, the expert's proposed testimony would not have been admissible even if the trial court had granted Pelfrey's continuance request.

{¶ 71} Pelfrey's second assignment of error is overruled.

### V. Right to Speedy Trial

{¶ 72} In his fourth assignment of error, Pelfrey claims that the trial court violated his right to a speedy trial. We note that Pelfrey's argument apparently relies on R.C. 2945.71, Ohio's speedy trial statute. Pelfrey does not mention the IAD or discuss its requirements in this assignment of error. Accordingly, we will confine ourselves to Pelfrey's statutory rights under R.C. 2945.71.

{¶ 73} At the outset, Pelfrey's motions to dismiss on speedy trial grounds were based on an alleged violation of the IAD. Pelfrey did not seek dismissal of any of the charges based on R.C. 2945.71. Accordingly, he has waived all but plain error. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 74} The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. In Ohio, R.C. 2945.71 requires the State to bring a felony defendant to trial within 270 days of arrest. R.C. 2945.71(C). Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three pursuant to the triple-count provision of R.C. 2945.71(E). This "triple-count" provision reduces to 90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial. *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 31 (2d Dist.).

{¶ 75} Pursuant to R.C. 2945.71(H), the time within which an accused must be brought to trial is extended by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."

{¶ 76} Pelfrey was indicted on November 6, 2015 for two counts of theft from an

elderly or disabled adult and one count of forgery (A Indictment). At this time, Pelfrey was incarcerated in Danville, Kentucky, and he was not immediately served with the indictment. On June 30, 2016, Pelfrey sought to be returned to Ohio to face the charges. On July 6, 2016, Pelfrey was served with the indictment and transferred to the Montgomery County Jail. Pelfrey asserts in his appellate brief that his speedy trial time began to run on July 7, 2016, the day after he was served with the indictment.

{¶ 77} Pelfrey was indicted for one county of tampering with evidence on October 7, 2016 (B Indictment), and a second count of tampering with evidence on November 16, 2016 (C Indictment). For speedy trial purposes, both of these charges were governed solely by R.C. 2945.71.

{¶ 78} Pelfrey agrees that the speedy trial time on the original indictment was tolled between July 26, 2016 and August 9, 2016, pursuant to defense counsel's request for a continuance to obtain additional discovery. Pelfrey was tried on all three indictments on January 30, 2017. However, Pelfrey asserts that his speedy trial time on the original indictment expired on October 18, 2016.

{¶ 79} Pelfrey's argument on appeal presumes that his speedy trial ran under the triple-count provision of R.C. 2945.71(E). However, Pelfrey was transferred to Ohio pursuant to the IAD on July 6, 2016. By definition, the IAD applies to individuals who are currently being incarcerated in another state. See R.C. 2963.30. Accordingly, Pelfrey was not being held solely on the instant charges in lieu of bail while awaiting trial in this case. Pelfrey was not entitled to the triple-count provisions of R.C. 2945.71.

{¶ 80} Pelfrey was brought to trial on January 30, 2017. Assuming for sake of argument that Pelfrey's speedy trial time under R.C. 2945.71 began on July 7, 2016, as

Pelfrey claims, he was brought to trial within 270 days of that date. Pelfrey has not demonstrated that his speedy trial rights under R.C. 2945.71 were violated. Accordingly, his fourth assignment of error is overruled.

### VI. Parol Evidence Rule

{¶ 81} In his fifth assignment of error, Pelfrey claims that the trial court abused its discretion in allowing parol evidence regarding the power of attorney. Specifically, Pelfrey asserts that Daniel should not have been permitted to testify "as to her understanding of the contents of this power of attorney based on alleged prior or contemporaneous statements by Defendant rather than the power of attorney itself * * *."

{¶ 82} The parol evidence rule "is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements. When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *Williams v. Spitzer Autoworld Canton, L.L.C.*, 122 Ohio St.3d 546, 2009-Ohio-3554, 913 N.E.2d 410, ¶ 14; *Mishler v. Hale*, 2014-Ohio-5805, 26 N.E.3d 1260, ¶ 29 (2d Dist.). "The principal purpose of the parol evidence rule is to protect the integrity of written contracts." *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27, 734 N.E.2d 782 (2000). The parol evidence rule thus bars extrinsic evidence of prior oral representations that contradict the parties' final written contract. *Williams* at ¶ 17.

{¶ 83} Nevertheless, the parol evidence rule does not preclude a party from presenting evidence that it was fraudulently induced to enter into a contract, if the

fraudulent promise is independent of the contract terms or consistent with the contract terms. *Galmish* at 28; *Woods v. Cobbins*, 2d Dist. Montgomery No. 20295, 2004-Ohio-5767, ¶ 20. "It was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery." *Galmish* at 28, quoting 37 American Jurisprudence 2d, Fraud and Deceit, Section 451, at 621-622 (1968) (footnotes omitted.).

**{¶ 84}** Here, Daniel's testimony about the power of attorney was relevant to whether Pelfrey altered the power of attorney that Daniel actually signed and used a forged document to obtain the $75,000 loan (Count 2 of the A Indictment). Daniel's testimony was also relevant to both theft counts, i.e., whether Daniel's actions in obtaining the $75,000 were beyond the scope of Daniel's consent and whether Pelfrey obtained the money by deceiving Daniel. Under these circumstances, the parol evidence rule did not bar Daniel's testimony.

**{¶ 85}** Daniel's fifth assignment of error is overruled.

## VII. Conclusion

**{¶ 86}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Mathias H. Heck
Heather N. Jans

J. David Turner
Hon. Gregory F. Singer